**CITY OF MANASSAS PARK, a Municipal Corporation**

v.

**The UNITED STATES.**

**No. 506–78.**

United States Court of Claims.

July 16, 1980.

Charles S. Perry, Fairfax, Va., attorney of record for City of Manassas Park; Edward F. Rodriguez, Jr., Stephen M. Colangelo and Boothe, Prichard & Dudley, Fairfax, Va., of counsel.

C. Stanley Dees, Washington, D. C., Turner T. Smith, Richmond, Va., for third–party plaintiff, Upper Occoquan Sewage Authority; Maureen Duignan and Sellers, Conner & Cuneo, Washington, D. C., of counsel.

Robert W. Bendall, Richmond, Va., for third–party plaintiff, City of Manassas; Smith & Davenport, Manassas, Va., of counsel.

T. A. Emerson, Richmond, Va., for third–party plaintiff, Prince William County.

Kathryn M. Anderson, Fairfax, Va., for third–party plaintiff, Bd. of Supervisors, Fairfax County.

Robert M. Hollis, Washington, D. C., with whom was Asst. Atty. Gen. Alice Daniel, Washington, D. C., for defendant; Lee Dehihns, of counsel.

Before SKELTON, Senior Judge, and NICHOLS and SMITH, Judges.

## ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

NICHOLS, Judge:

By the amended petitions the principal or lead claimant is the Upper Occoquan Sewage Authority (UOSA), a body corporate and politic of the Commonwealth of Virginia. Four creatures of that Commonwealth, Manassas, Manassas Park, Fairfax County, and Prince William County (municipalities), entered into a service agreement with UOSA to provide for an advanced waste water treatment system for the upper Occoquan, which flows into the Potomac. Manassas Park originally filed this action, and the other municipalities would now join as third parties. UOSA now claims to be suing for their benefit. The grant contract sued on here was made by UOSA with the United States Environmental Protection Agency (EPA) pursuant to the Federal Water Pollution Control Act, 33 U.S.C. § 1251 and ff, and specifically § 1281(g)(1). The federal share of the grant is limited by § 1282 to 75 percent of cost, and the remainder must be borne by the grantee. UOSA having no taxing or borrowing authority of its own, any increase in the grantee's share is immediately borne by its founder municipalities.

The grievance here is that EPA arbitrarily and needlessly caused an increase in the project cost, rounded off, from $49,300,000 to $82,280,000, with corresponding increase ultimately borne by the municipalities of their ungranted 25 percent. It is not disputed that the government has absorbed and paid the corresponding larger increase in its own grant costs, occasioned by its own alleged folly. What the plaintiffs want is for the government to absorb enough more of their costs to reduce their burden to 25 percent of $49,300,000, not $82,280,000. We state the case at this point as it is stated to us. No evidence has yet been taken as to the actual extent of the cost overrun or the extent to which EPA caused it, and of course we make no fact–finding. The immediate problem of UOSA and the municipalities is to state their claim in a fashion that brings it within the jurisdiction of this court as against defendant's motion for summary judgment. We hold that they do not succeed.

The EPA, having spread the necessary granted funds over three years, construed its own regulation, as it then was, 40 C.F.R. § 35.603(a), 38 Fed.Reg. 5329 (1973), to require that the use of each annual grant be such as to produce a "complete and operable treatment works." Thus, in case of an unforeseen cutoff in later years, an earlier grant would not be exhausted in an unfinished and useless facility. It is easy to see how such a requirement might elevate the costs, as plaintiffs say it did, and it is ironic that it resulted from an effort at economy,

President Nixon having impounded part of the grant funds. Whether EPA correctly construed its own regulations is one of the things the parties dispute, but we pass it over as an answer either way would not affect the result. EPA rejected plaintiffs' original plans because they did not conform to the regulation as interpreted. Plaintiffs submitted revised plans which did, and were approved. Plaintiffs are thus in the position of having acquiesced in the change. Their explanation for this is that they were not aware how great the cost overrun would be. They do not now show that EPA knew more, but hope to learn of something along the line of "superior knowledge" on discovery. We do not think such discovery is necessary as evidence of "superior knowledge," if discovered, would not affect our conclusion.

■ Plaintiffs suggest without much conviction that their acquiescence was the product of duress. Their explanation is that under the statute the municipalities were responsible to correct the excess of their pollution of navigable waters over allowable limits, by statutory deadline dates, whether or not they received grants to aid them in doing so. *State Water Control Board v. Train*, 559 F.2d 921 (4th Cir. 1977). Therefore, as a practical matter, UOSA had no real option, it says, but to agree with whatever EPA proposed. We do not think enactment by Congress of laws protecting navigable waters, not asserted to be outside its constitutional power, could ever be held to constitute duress in the sense of the law of contracts. Rather they are "sovereign acts." *D. R. Smalley & Sons, Inc. v. United States*, 178 Ct.Cl. 593, 372 F.2d 505, *cert. denied*, 389 U.S. 835, 88 S.Ct. 45, 19 L.Ed.2d 97 (1967). In any case it appears that by January 2, 1974, the Congress expressly negated the involved EPA interpretation by Pub.L. No. 93–243, 33 U.S.C. § 1283(d). This came soon enough to rescue all other municipalities from the extravagance in which UOSA says it was entrapped, and no doubt would have rescued UOSA too if it had dragged its feet just a little and for long enough. It is difficult to see duress in a good faith executive policy the Congress

no sooner heard of then corrected, and we consider the duress issue no further.

A leading case in this court, *Eastport Steamship Corp. v. United States*, 178 Ct.Cl. 599, 372 F.2d 1002 (1967), analyzes our jurisdiction under the Tucker Act, 28 U.S.C. § 1491, which is here invoked. It says noncontract claims must be for money, and must be in one or the other of two categories. The first is for money illegally exacted, and in Treasury coffers, as, *e. g.*, tax refund claims. The second is when the claimant urges that some specific provision of law commands expressly or by implication the payment of money, upon proof of conditions he is said to meet, *e. g.*, fifth amendment taking claims or claims by illegally discharged government employees for back pay. The Supreme Court approved this analysis in *United States v. Testan*, 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976) and applied it to exclude from our Tucker Act jurisdiction a claim that did not pass the *Eastport Steamship* test. Thus not every instance of misgovernment by a United States agency that is costly to private parties, or local and state interests, generates a valid Tucker Act claim. The misgovernment, *e. g.*, in *Eastport* caused the claimant company to lose an opportunity to sell a ship to foreign buyers at a good price, and made necessary acceptance of a much less favorable price a few months later. As we read the plaintiffs, they do not contend that their case will stand by either of the *Eastport* tests. They accept the onus of showing that their claim is founded on their interpretation of the grant agreement, the only privity of contract that existed with defendant.

■ They say they want an "equitable adjustment" in the grant agreement. But this term, familiar in litigation founded on the standard government disputes clause, not here involved, is inappropriate here. We think what they really want is an equitable reformation. What they would do is to reform the agreement and enforce it as reformed. But there was no duress the law can recognize and no mistake, as both sides

knew what they were doing, even if they failed to foresee the full pecuniary consequences. There is no intimation of fraud. They say that the grant agreement imposed "commercially impracticable" requirements; that there was an "implied warranty" that the UOSA plant could be constructed reasonably on an operable unit basis. They cite cases where, in supply or construction contracts, the government imposed impossible or impracticable requirements on suppliers or vendors. They rely on Mr. Justice Brandeis' doctrine, *United States v. Spearin*, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918), that when the government prescribes design specifications, it warrants that an acceptable product can be produced according to them. But here, unlike the *Spearin* situation, it was the grantee who furnished the plans. If any party warranted that they were commercially practicable, it would seem it would have been the grantee.

Our leading recent case on grant agreements, *State of Texas v. United States*, 210 Ct.Cl. 522, 537 F.2d 466 (1976), holds that such an agreement is a contract enforceable in this court, but in such enforcement the government is bound only by its express undertakings. 210 Ct.Cl. at 531, 537 F.2d at 470–71. This without more would be fatal to the claim here, for the government's express undertaking was to pay 75 percent of the project cost, which it has done, and claimants would have it pay more. It may be conceded *arguendo*, that this statement does not prohibit the appropriate use of *Spearin* or other implied warranties, but what use is appropriate is influenced by the gratuitous nature of the grant. The responsibility to dispose of human waste without polluting navigable water is, after all, the state's, and the government acts on the scene as a deep–pockets volunteer. While we are not passing on a claim by the government against the state's subdivisions, the sources of the plans, such a claim on a *Spearin* theory would be far more plausible than the use of *Spearin* to support the instant claim. When the government prescribes how grant money is to be used, it is performing sovereign acts for which it is

not liable on a contract theory. *D. R. Smalley & Sons, Inc. v. United States, supra.*

In the circumstances of this case, therefore, the government could not by rejecting plans not prepared on the operable unit basis, and accepting plans that were, be deemed to warrant that the approved plans were practicable or reasonable. The claim is therefore not contractual, but is one for misgovernment excluded from Tucker Act jurisdiction by the *Eastport Steamship* analysis.

This conclusion makes it unnecessary to consider whether or not the various municipalities, not in direct contract privity with the government, may join in this litigation on a third–party beneficiary theory. There is now no litigation to join in. The defendant's motion for summary judgment is granted and the petitions are dismissed.