**ATLANTIC CITY MUNICIPAL UTILITIES AUTHORITY, Plaintiff,**

v.

**REGIONAL ADMINISTRATOR, REGION II, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Defendant.**

Civ. A. No. 85–0906.

United States District Court, D. New Jersey.

Aug. 27, 1985.

---

Slap, Williams & Cuker, By: Albert J. Slap (argued) Philadelphia, Pa., admitted pro hac vice and John C. Matthews, Atlantic City, N.J., for plaintiff.

Mary Gibbons Whipple, Asst. U.S. Atty., Trenton, N.J., and Ann C. Hurley, U.S.

Dept. of Justice, Environmental Defense Section, Washington, D.C., for defendant.

## OPINION

COHEN, Senior District Judge:

This injunctive action is before the Court on a motion to dismiss for lack of subject matter jurisdiction made by the defendant, the Regional Administrator of Region II (the Regional Administrator) of the United States Environmental Protection Agency (EPA). Alternatively, the EPA seeks summary judgment on the merits of the underlying action which has been brought pursuant to the citizen suit provision of the Federal Water Pollution Control Act (FWPCA) (the relevant portions of which are sometimes referred to as the Clean Water Act), 33 U.S.C. § 1251 et seq. Because we find that the plaintiff seeks to have this Court order the EPA Regional Administrator to perform a nondiscretionary duty, we shall hold that we have citizen suit jurisdiction pursuant to 33 U.S.C. § 1365(a)(2).

Because we further find that the EPA has properly insisted that, in order to receive a $3.5 million construction grant, plaintiff must obtain current state certification of its plan, we shall grant defendant's motion for summary judgment.

## I. Facts and Procedural History

The plaintiff in this action is the Atlantic City Municipal Utilities Authority (ACMUA), a municipal corporation of the State of New Jersey operating pursuant to N.J. S.A. 40:14B–1 et seq. In August of 1980, the ACMUA submitted an application for an EPA grant to pay for the cost of acquiring a sewage collection system in Atlantic City, New Jersey. Pursuant to the Clean Water Act, plaintiff's application was first addressed to the New Jersey Department of Environmental Protection (NJDEP). In order to understand our response to plaintiff's subsequent complaints, it is necessary to gain some familiarity with the FWPCA funding scheme.

### A. The Clean Water Act Construction Grants Application Process

Grant funds are annually appropriated by Congress and distributed by the EPA to citizens of the states based upon an allotment formula found at 33 U.S.C. § 1285. Currently, New Jersey entities receive about 4.2% of the total dollars available. Since September 30, 1984, these federal grants have provided up to 55% of a project's total construction cost. Prior to the FWPCA amendment that set this maximum, EPA grants could provide up to 75% of total costs.[1]

In order to become eligible for a Clean Water Act grant,[2] an organization must first obtain a favorable ranking in a state's project priority list. See 33 U.S.C. § 1313(e)(3)(H). In New Jersey, these lists are annually prepared by NJDEP, the state agency designated by the Governor as having responsibility for the administration of EPA construction grants. See 40 C.F.R. § 35.2005(b)(42) (1984) (hereinafter all CFR citations are to the 1984 volume unless otherwise noted). Each NJDEP project priority list "contains two portions: the fundable portion, consisting of those projects anticipated to be funded from funds [currently] available ... and the planning portion, consisting of projects anticipated to be funded from future authorized allotments." 40 C.F.R. § 35.2015(c). In determining the relative desirability of competing treatment

1. The amendment in question was enacted in 1981, the year in which plaintiff's grant application was certified for EPA funding. Notwithstanding its previous contentions of EPA bad faith, the plaintiff has never alleged that this amendment has had any impact on the current dispute.

2. The grant money in question, which is available to provide financial assistance for the construction of sewage treatment facilities, is often referred to as a "Step 3" grant. The EPA also awards grants in order to permit applicants to undertake feasibility studies (Step 1 grants) and to prepare resulting drawings and specifications (Step 2 grants). See H.R.Rep. No. 270, 97th Cong., 1st Sess. 4, reprinted in 1981 U.S.Code Cong. & Ad.News 2629, 2632. Because neither of the preliminary investigative types of grants are at issue, we shall not employ the "step" nomenclature.

projects, the NJDEP considers the cost of competing projects and the estimated public benefits to be derived therefrom as well as the propriety of federal aid. The last consideration depends upon several specific criteria codified at 33 U.S.C. § 1284 and 40 C.F.R. § 35.830(b).

If a grant application receives a favorable ranking on a state's priority list, its fate passes to the EPA Administrator, *see* 33 U.S.C. § 1296, who must approve or disapprove the application within forty-five days after the date of its receipt. 33 U.S.C. § 1299. Applications not acted upon within this time period are deemed approved. *Id.* The EPA's evaluation employs the same criteria as the state certification process and, in addition, the Administrator determines the following: (1) whether the proposed project conforms with the state water pollution control plan and has received priority certification by the relevant state agency; (2) whether the project is included in an effective basinwide plan for pollution abatement; (3) whether the project is included in an effective metropolitan or regional plan developed and certified by the Governors of the states affected; and (4) whether the grant applicant has demonstrated that the project will adequately and efficiently treat liquid wastes. *See* 40 C.F.R. § 35.835-1 to -7. *See also* 33 U.S.C. §§ 1284(b)(1) & 1296. In addition, where an existing water treatment facility is being modified, the grant applicant must provide assurance to the Regional Administrator that it will remain operable during construction. 40 C.F.R. § 35.835-8. Finally, the state water pollution control agency must provide assurance of at least annual inspection of the facility for the first three years following construction. *Id.* at -9.

The process by which appeals are taken from a Regional Administrator's determination of funding eligibility (or ineligibility) has recently been changed. ACMUA's appeal, which is more fully discussed below, was taken to the EPA Board of Assistance Appeals. This Board, which was established by the EPA in 1979, provided an adversarial dispute resolution format. Its procedures are published at 44 Fed.Reg. 46,770 (1979) (never codified in CFR). Seeking a more "simple, expeditious and inexpensive means to resolve disputes," *see* 48 Fed.Reg. 45,061 (1983), the EPA developed a new administrative review process which is described at 40 C.F.R. § 30, Subpart L (§§ 30.1200-.1235). The new review process has only recently become effective because the Board of Assistance Appeals was charged with resolving all appeals docketed on or before October 31, 1983.

Pursuant to the new appeals process, a Regional Administrator's grant decisions are conclusive unless a petition for a *discretionary review* is filed to the EPA Assistant Administrator within thirty days of the date of the Regional Administrator's decision. 40 C.F.R. § 30.1225. As implied, the Assistant Administrator may decide not to review the Regional Administrator's decision. *Id.* at § 30.1225(2)(b). Thus, in many cases, the decisions made by the Regional Administrators will be the final decisions of the EPA.

If a construction grant application is approved, the EPA prepares an assistance agreement which must be signed by the grant applicant within three weeks after receipt. *Id.* at § 30.305(a). The execution of an assistance agreement creates contractual obligations both on the part of the EPA and on the part of the grant recipient. The obligations of the latter are explicitly nondelegable. *Id.* at § 30.309. Disagreements about assistance agreement requirements are handled in the same manner as those regarding funding applications. *Id.* at § 30.1200.

## B. *ACMUA's Construction Grant Application*

The plaintiff submitted its grant application to the NJDEP on August 5, 1980 and therein requested the state to include the purchase of a privately owned, sewage collection system on its priority list for fiscal year (FY) 1980. The application was atypical in this respect because EPA policy clearly favors the funding of new sewage

system constructions rather than the rehabilitation of old systems. Nevertheless, the FWPCA broadly defines the term "construction" to include acquisitions and EPA regulations specifically authorize regional administrators to award grants for the acquisition of existing treatment facilities. 40 C.F.R. § 35.940–3(d).

Apparently impressed by the need to rehabilitate the Atlantic City system, construction of which began in 1885, as well as the engineering and economic analyses obtained by the ACMUA, the New Jersey Construction Grants Administrator informed the group, by letter dated May 19, 1980, that he would support their funding application. The project received official support on the FY 1981 priority list and was ranked number 154 out of 231 eligible projects.[3]

This litigation essentially began when the EPA Regional Administrator denied funding for the state certified project in FY 1981.

His denial was based on the following reasons:

1. The acquisition did not conform with EPA's policy of assigning the highest priority to the construction of new facilities.

2. The acquisition would not eliminate existing pollution and enhance water quality.

3. Apparently, the ACMUA grant application was also given some kind of informal NJDEP approval in FY 1980 despite not having been placed on the state's priority list for the year. *See* EPA Bd. op. at 3.

4. The draft RPM provides that:

Acquisition of an operable portion of a treatment works is generally not an allowable grant cost. However, the Regional Administrator may allow the acquisition of any or all portions of an existing treatment works in the limited and rare occasions when all the following criteria can be fulfilled:

1. The acquisition would be consistent with established policy that the highest priority is assigned to the construction of facilities which will reduce pollution from the existing population and enhance water quality.

2. The acquisition has received a separate project priority certification from the State's water pollution control agency.

3. If the acquisition were funded by EPA, the result, contrary to EPA policy, would be to reduce the debt the Authority would incur in purchasing the collection system.

Appeal of ACMUA, Docket No. 81–19, EPA Board of Assistance Appeals, slip op. at 4 (attached as Exhibit B to plaintiff's complaint) (hereinafter cited as EPA Bd. op.). Pursuant to the aforementioned dispute resolution provisions of the EPA regulations, the ACMUA appealed the Regional Administrator's decision to the EPA Board of Assistance Appeals (the Board) and on October 28, 1982, the Board reversed the regional determination.

The Board's reversal was based primarily on its interpretation of a draft Construction Grants Program Requirements Memorandum (RPM), dated November 16, 1979, which provides the EPA's only guidelines for the acquisition of pre-existing sewage facilities.[4] *See* 40 C.F.R. § 35.940–3(d). The Board found that each of seven criteria enumerated therein had been met. Specifically, the Board found "that the clear weight of the evidence demonstrates that significant pollution benefits will be gained by acquiring and rehabilitating the existing system." EPA Bd. op. at 7. Additionally, New Jersey's low number of new construction projects would have permitted the AC-

3. A facility planning type analysis unquestionably supports the acquisition as the cost-effective means of reducing existing pollution in order to meet the discharge requirements of the [state] permit.

4. The acquisition does not result in a change of ownership or restructuring of the financial investment without any additional pollution control benefits.

5. The construction or previous purchase of the acquisition did not involve Federal or public monies.

6. The acquisition costs are reasonable, computed in accordance with established Federal practices, and otherwise allowable.

7. The acquisition does not circumvent any statutory requirements, such as an environmental review.

The Regional Administrator's three stated reasons for denying the grant appear to have been based upon criteria one and four. EPA Bd. op. at 4–5.

MUA's acquisition of the privately owned system without jeopardizing federal funding for any new construction projects. *Id.* at 8. Finally, the Board found that the proposed rehabilitation was "the most cost-effective and practicable alternative" for providing pollution control benefits to the area, *id.* at 9, and that the rehabilitation could not begin until the ACMUA purchased the system. *Id.* at 8. Thus, the Board concluded that the Regional Administrator's denial was "unreasonable and . . . supported by neither the facts nor the law." *Id.* at 11.

Approximately nine months after rendering this decision, the Board denied the Regional Administrator's motion for reconsideration. The Board succinctly reaffirmed that it had based its holding on the draft RPM criteria. Accordingly, the Board concluded that ACMUA's purchase "of the sewer system *is entitled* to be federally funded." EPA Bd. Reconsideration op. at 2 (attached as Exhibit C to plaintiff's complaint) (emphasis supplied).

Although this language seems mandatory and unqualified, the Regional Administrator's subsequent refusal to release the requested EPA funds did not contradict or resist the Board's directive. Instead, the Regional Administrator refused to grant EPA funds to the ACMUA for a reason which was not addressed by the EPA Board of Appeals: New Jersey had not certified the ACMUA project since FY 1981 and he felt that it was necessary, pursuant to 33 U.S.C. § 1284(a)(3),[5] to confirm that the project was still supported at the state level and thereby entitled to a place on New Jersey's FY 1985 priority list. *See* Affidavit of William J. Muszynski, Regional Director of EPA Region II (attached to Defendant's Brief).

Initially, the reason for the Regional Administrator's refusal to release the funds in question to the ACMUA seemed to be the only material fact in dispute in this case. The dispute, however, was never genuine.[6] Instead, the controversy consisted only of the ACMUA's bald assertion, in its complaint, that the refusal of the Regional Administrator, William J. Muszynski, was motivated by bad faith. Now, however, the ACMUA does not dispute Mr. Muszynski's affidavit and accepts that his refusal was based on its failure to obtain recertification from the NJDEP. *See* Plaintiff's Brief at 2. Plaintiffs also agree that "[n]o material facts are in dispute." *Id.* at 1. Thus, the substantive issue presented by this case is whether the Regional Administrator properly refused to release the money sought from the EPA because the plaintiff's project had not become state certified in the current fiscal year even though the subject grant had received priority listing in a previous year and was not funded because of an erroneous interpretation of the relevant EPA regulations by the EPA Regional Administrator. We, of course, cannot reach this determination unless we first decide that this Court is vested with subject matter jurisdiction.[7]

---

**5.** In pertinent part, 33 U.S.C. § 1284(a) provides:

> Before approving grants for any project . . . the Administrator shall determine—
>
> .  .  .  .  .
>
> (3) that such works have been certified by the appropriate state water pollution control agency as entitled to priority over such other works in accordance with any applicable state plan. . . .
>
> The question of whether *annual* certification is required is addressed *infra* pp. 733–734.

**6.** *See* Fed.R.Civ.P. 56(e). Moreover, even without regard to defendant's summary judgment motion, the plaintiff bears both the initial and final burden of proving that this Court has subject matter jurisdiction. *E.g., Thomson v. Gaskill,* 315 U.S. 442, 446, 62 S.Ct. 673, 675, 86 L.Ed. 951 (1942).

**7.** Although we shall address the jurisdiction question first, the jurisdictional and substantive issues presented by this case actually are curiously interwoven. If the Regional Administrator's decision, to deny funding to any project that does not appear on a current state priority list, is deemed to be discretionary, any judicial review thereof would not be plenary and his decision would stand absent an abuse of discretion. Yet, if the decision is deemed to be discretionary, this Court does not have subject matter jurisdiction to review it pursuant to the FWPCA "citizen suit" provision, 33 U.S.C. § 1365(a)(2),

## II. Discussion

### A. Plaintiff's Complaint and Requests for Relief

. Defendant's primary contention is that "the relief sought [by ACMUA] is in actuality an order compelling a payment of money [by the United States] in excess of $3,573,750.00." Defendants' Brief at 7. Thus, defendants contend that ACMUA's claim falls squarely within the exclusive Tucker Act jurisdiction of the Claims Court. At first blush, this contention is not unsupportable. *See, e.g., United States v. City of Kansas City, Kansas,* 761 F.2d 605, 608 (10th Cir.1985). For the reasons which follow, however, we disagree.

It is, of course, first necessary to scrutinize plaintiff's requests for relief and determine the identity of the real parties in interest. In its complaint, the plaintiff maintains that the EPA should have provided it with the requested grant money as soon as the EPA Board of Assistance Appeals (the Board) reversed the Regional Administrator's ineligibility determination. Plaintiff appears to have taken umbrage when the Administrator sought Board reconsideration, Plaintiff's Complaint ¶ 16, and was obviously piqued when the Administrator required FY 1985 state certification. *Id.* at ¶¶ 19–22. In fact, plaintiff maintained that EPA's decisions were not only in bad faith, but "manifest[ed] a conduct that is outrageous and is abhorrent to the democratic system of government." *Id.* at ¶¶ 30–31. Not surprisingly, therefore, the plaintiff requested this Court to "[a]ssess punitive damages against those EPA employees who are responsible for not following the requirements of the law and the express directions of the Board." Yet, these employees have never been named as defendants. Thus, without regard to its otherwise dubious merits, this relief could not be granted even assuming *arguendo* the availability of punitive damage awards, *see* 33 U.S.C. § 1319(d) and the absence of jurisdictional obstacles.

Plaintiff also seeks injunctive relief. Specifically, the ACMUA requests this Court to order the EPA to provide it with the grant certified in the NJDEP FY 1981 priority list. Additionally, plaintiff seeks an order compelling the EPA "to pay any shortfall in the amount ACMUA needs to purchase" the sewage treatment system at 1985 prices.

■ The citizen suit provision, discussed more fully below, explicitly empowers a court to order the EPA Administrator to perform nondiscretionary duties and to apply "any appropriate civil remedies under section 1319(d) of [the FWPCA]." 33 U.S.C. § 1365(a). The question of whether a request, like the plaintiff's herein, which seeks to have the Court order the EPA to disburse grant funds, is within the injunctive ambit of § 1365(a) or is a thinly disguised demand for unavailable damages is not easily answered. Although this question is considered at some length below, it is not dispositive. Instead, we shall hold that this Court has jurisdiction, pursuant to § 1365, to order the EPA Administrator to perform a nondiscretionary duty, specifically, to determine whether the appropriate state agency has certified that a grant application is entitled to priority over others on a state's priority list. *See* 33 U.S.C. § 1284(a)(3).

Plaintiff's remaining claims for relief seek an award of costs and counsel fees as well as whatever other legal and equitable relief this Court deems to be just and proper. The FWPCA specifically authorizes awards of the costs of litigation in appropriate citizen suits. *See* 33 U.S.C. § 1365(d). Thus, except regarding its merits, this request need not engender particular discussion.

■ Similarly, we think it is clear that both plaintiff's request for injunctive relief and other "just and proper" equitable relief encompass a permissible request for a declaration regarding the need for current NJDEP certification. *See* Fed.R.Civ.P. 57. Certainly, we could not order the EPA Ad-

the only jurisdictional basis proffered by the plaintiff for our consideration.

ministrator to abandon his insistance on FY 1985 state certification without first finding and declaring that the same is not required by the FWPCA. Moreover, the immediacy of their controversy and the adverse interests of the parties warrant this kind of equitable relief. *See Middlesex Cty. Sewerage Auth. v. Sea Clammers,* 453 U.S. 1, 14–17, 101 S.Ct. 2615, 2623–24, 69 L.Ed.2d 435 (1981); *Maryland Cas. Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941). *Compare J.E. Brenneman v. Schramm,* 473 F.Supp. 1316, 1319–20 (E.D.Pa.1979) (contractor lacked standing to contest EPA Administrator's failure to require a grant recipient to submit cost estimates). This construction of plaintiff's complaint does not complicate our jurisdictional inquiry because the Declaratory Judgment Act, 28 U.S.C. §§ 2201 & 2202, does not serve as an independent source of subject matter jurisdiction. *See Bulk Distribution Centers, Inc. v. Monsanto Co.,* 589 F.Supp. 1437, 1438 (S.D.Fla.1984) (citing *Skelly Oil Co. v. Phillips Petroleum Co.,* 339 U.S. 667, 671, 70 S.Ct. 876, 878, 94 L.Ed. 1194 (1950)).

Although unspecific in this regard, plaintiff's complaint seems clearly to be directed against the Regional Administrator (who is not identified) in his official capacity. Thus, if successful, it would operate against the sovereign and the Tucker Act, discussed below, may be applicable. *See, e.g., Hawaii v. Gordon,* 373 U.S. 57, 58, 83 S.Ct. 1052, 1052, 10 L.Ed.2d 191 (1941); *Portsmouth Redevelopment & Housing Auth. v. Pierce,* 706 F.2d 471, 473 (4th Cir.1983). *Contra Williamsport Sanitary*

*Authority v. Train* 464 F.Supp. 768, 775 (M.D.Pa.1979).

Similarly, because the determinations of the Regional Administrator in this context are often final EPA determinations, *see supra* p. 725, we shall construe plaintiff's complaint as stating a cause of action against the EPA Administrator thereby rendering the citizen suit provision of the FWPCA applicable. Ultimately, it is the EPA Administrator who is charged with the responsibility of determining whether a state certified project is entitled to funding. 33 U.S.C. § 1284. Thus, we would not dismiss plaintiff's complaint for lack of subject matter jurisdiction merely because it names as defendant the EPA Regional Administrator, instead of the EPA Administrator, without first permitting the appropriate amendment. *See* Fed.R.Civ.P. 15. Our subsequent disposition makes this amendment unnecessary.

B. *Sovereign Immunity, the Tucker Act, and the Jurisdiction of the Claims Court*

■ As just mentioned, suits against a federal official for acts performed within his official capacity are actions against the sovereign and are prohibited in the absence of Congressional consent. *See, e.g., United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976). Further, because it evinces a waiver of sovereign immunity, the grant of such a right of action must be made with specificity and not by implication. *Id.*

■ The Tucker Act, 28 U.S.C. §§ 1346 and 1491,[8] is a jurisdictional stat-

8. Section 1346(a)(2) provides district courts with jurisdiction, concurrent with the Claims Court, over

> Any other civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort, except that the district courts shall not have jurisdiction of any civil action or claim against the United States founded upon any express or implied

contract with the United States or for liquidated or unliquidated damages in cases not sounding in tort which are subject to sections 8(g)(1) of the Contract Disputes Act of 1978. 28 U.S.C.A. § 1346 (West Supp.1985).

In relevant part, § 1491 provides:

(a)(1) The United States Claims Court shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liqui-

**730**

ute that does not itself create any substantive rights against the United States. Instead, it establishes

> three conditions which, if satisfied, vest subject matter jurisdiction exclusively in the Claims Court. The action must be against the United States, seek monetary relief in excess of $10,000, and be founded upon the Constitution, federal statute, executive regulation, or government contract.

*Portsmouth Redevelopment,* 706 F.2d at 473. *But cf. Coco Bros., Inc. v. Pierce,* 741 F.2d 675 (3d Cir.1984) (Claims Court's equitable jurisdiction is not exclusive of that of the district courts). Not every claim invoking the Constitution, a federal statute or regulation, however, creates a claim cognizable in the Claims Court.[9] The noncontractual claims considered under § 1491

> can be divided into two somewhat overlapping classes—those in which the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum; and those demands in which money has not been paid but the plaintiff asserts that he is nevertheless entitled to a payment from the treasury ... [because of] a particular provision of law.

*Eastport Steamship Company v. United States,* 372 F.2d 1002, 1007, 178 Ct.Cl. 599 (1967). The *Eastport Steamship* analysis of the Claims Court's noncontractual jurisdiction was approved by the Supreme Court in *Testan,* 424 U.S. at 398, 96 S.Ct. at 953, and further clarified by the Claims Court in *City of Manassas Park v. United States,* 633 F.2d 181, 224 Ct.Cl. 515 (1980). There, Judge Nichols provided helpful examples of the two categories of noncontractual claims that are within the Claims Court's exclusive jurisdiction.

> dated or unliquidated damages in cases not sounding in tort.
>
> . . . . .
>
> (3) To afford complete relief on any contract claim brought before the contract is awarded, the court shall have exclusive jurisdiction to grant declaratory judgments and such equitable and extraordinary relief as it deems proper, including but not limited to injunctive relief. In exercising this jurisdic-

The first [category] is for money illegally exacted, and in Treasury coffers, as, *e.g.,* tax refund claims. The second is when the claimant urges that some specific provision of law commands expressly or by implication the payment of money, upon proof of conditions he is said to meet, *e.g.,* fifth amendment taking claims or claims by illegally discharged government employees for back pay.

*Id.* 633 F.2d at 183. Before considering the claims of the plaintiffs herein in the light of this analysis, we note further that Congress can withdraw the Claims Court's exclusive Tucker Act jurisdiction via subsequent legislation but that a court should not find such "partial repeals" of the Tucker Act to have been made "*by implication.*" *Ruckelshaus v. Monsanto Co.,* —— U.S. ——, 104 S.Ct. 2862, 2881, 81 L.Ed.2d 815 (1984) (emphasis supplied).

Although the EPA insists that plaintiff's claim lies within the exclusive jurisdiction of the Claims Court, it does not attempt to identify the claim as contractual or as arising under a specific federal statute or regulation. Instead, the defendant relies on two similar cases and concludes that courts have repeatedly held that claims like those of the ACMUA were "monetary ... in excess of $10,000 and, as such, were within the Claims Court's exclusive jurisdiction." Defendant's Brief at 9. Examination of these two cases, *Heart of Valley Metro. Sew. Dist. v. EPA,* 532 F.Supp. 314, 316 (E.D.Wis.1981) and *Concerned Citizens of Bushkill Township v. Costle,* 468 F.Supp. 21 (E.D.Pa.1978) *aff'd* 592 F.2d 164 (3d Cir.1979), as well as other precedent, is far more enlightening.

In *Heart of Valley,* the district court was presented with a jurisdictional dispute vir-

tion, the court shall give due regard to the interests of national defense and national security.

28 U.S.C.A. § 1491 (West Supp.1985).

**9.** "The Federal Court Improvements Act of 1982 created the Article I Claims Court and essentially transferred to it the trial jurisdiction of the former Court of Claims." *Coco Bros.,* 741 F.2d at 677.

tually identical to the one in the case *sub judice.* There, however, the plaintiff's grant application was denied funding by both the EPA Regional Director and by the Board of Assistance Appeals. The court properly noted that its "inquiry did not end with a finding that the [grant applicant was] seeking monetary relief in an amount greater than $10,000." 532 F.Supp. at 317. Instead, the court went on to consider whether Tucker Act jurisdiction existed by virtue of a government contract, or a federal statute or regulation.

The court subsequently rejected EPA's position that its refusal to approve the grant application constituted a contractual dispute. At the same time, the court recognized that an assistance agreement, engendered by a successful grant application, becomes a contractual obligation of the United States and is enforceable in the Court of Claims. *See, e.g., State of Texas v. United States,* 537 F.2d 466, 110 Ct.Cl. 522 (1976). We are in accord with each of these conclusions.

Finally, the *Heart of Valley* court considered whether the claim of a disappointed grant applicant fell within one of the two categories of the Claims Court's noncontractual jurisdiction. Judge Warren found that it did. Because the grant applicant's complaint sought federal funds based on "33 U.S.C. § 1281 *et seq.* [the FWPCA] and 40 C.F.R. § 35-940-3(b) [allowable treatment work costs]" it was included within the second noncontractual category. *Id.* at 318. For whatever reasons, however, after rejecting two alternative jurisdictional bases, 5 U.S.C. § 701 *et seq.* (the Administrative Procedure Act) and 28 U.S.C. § 1331 (federal question), the court did *not* consider whether the citizen suit provision of the FWPCA, 33 U.S.C. § 1365, withdrew the presumptively established Tucker Act jurisdiction. *See Monsanto,* 104 S.Ct. at 2881. Although we agree with all of Judge Warren's *stated* jurisdictional conclusions, we

believe it is necessary to make this final inquiry.

The suit in *Concerned Citizens* was initiated, appropriately enough, by groups of concerned citizens who claimed that EPA officials (individually named as defendants) had improperly awarded a construction grant to a sewer authority without first requiring, *inter alia,* an environmental impact statement. The sewer authority sought to intervene and to bring cross claims contending that the EPA had breached "the grant agreement as a contract" and failed to defend the concerned citizens's suit in good faith. 468 F.Supp. at 24. Judge Troutman concluded that the citizen suit provision did not provide a jurisdictional basis for these cross claims because they alleged that the EPA Administrator had failed to do only *discretionary* acts to which § 1365 clearly does not apply. *Id.* at 26.[10]

Although this aspect of Judge Troutman's opinion was not considered upon appeal, *see* 592 F.2d at 165 n. 2, we have no doubt as to its propriety. There seems to be little question that a Regional Administrator must use his discretion or judgment in order to determine whether a particular grant fund application meets the numerous criteria discussed *supra* at pp. 724–725. *See also United States v. City of Kansas,* 761 F.2d 605 (10th Cir.1985). Similarly, the manner in which one defends a lawsuit is inherently discretionary. Neither consideration, however, resolves the specific issue before this Court, *to wit:* May an EPA Administrator use his or her discretion to require current state certification in some but not in all proposed projects? If this question is answered in the negative, *i.e.,* if we find that current state certification is either required or not required *by the FWPCA* (and is not within the discretion of the EPA administrator), then *Concerned Citizens* is inapposite and that aspect of the Claims Court's jurisdiction, established by the second noncontractual category ar-

---

**10.** Judge Troutman also expressed concern about the sewer authority's failure to comply with the notice provision of § 1365. *Id.* at 26. *But see Pymatuning Water Shed Citizens For a*

*Hygienic Environment v. Eaton,* 506 F.Supp. 902 (W.D.Pa.1980) *aff'd* 644 F.2d 995 (3d Cir.1981) (per curiam) (notice requirement is not jurisdictional).

ticulated in *Eastport Steamship*, would not prevent our adjudication of the present controversy.

Review of two other cases is indispensable to a full understanding of the Claims Court jurisdiction as it relates to this case. In *City of Manassas Park v. United States*, 633 F.2d 181, 224 Ct.Cl. 515, *cert. denied*, 449 U.S. 1035, 101 S.Ct. 611, 66 L.Ed.2d 497 (1980), Judge Nichols, speaking for the Claims Court, noted that generally "[w]hen the government prescribes how grant money is to be used, it is performing sovereign acts for which it is not liable on a contract theory." *Id.* at 184. Accordingly, the court dismissed the claim of the plaintiff sewage authority as being outside the scope of its Tucker Act jurisdiction. This case has been misapprehended by present counsel who have proposed that it stands for the proposition that EPA grant agreements are unenforceable in the Claims Court. This is simply incorrect.

The sewer authority in *Manassas Park* (an EPA grant recipient) complained that the government "forced" it to accept a grant totalling 75% of an eighty-two million dollar sewage project when it only sought a grant for a forty-nine million dollar project. The EPA insisted on the larger amount in order to comply with its requirement that each grant be sufficient to produce a "complete and operable treatment works" thereby avoiding "unfinished and useless facilit[ies]." *Id.* at 182. The sewer authority agreed to the larger amount. In its subsequent suit, however, the authority sought an "equitable adjustment" in their grant agreement, which would make it responsible for 25% of only the $49,000,000 figure, contending that the government had somehow coerced its consent. Judge Nichols held that *this* claim was "not contractual but [was] one for misgovernment excluded from Tucker Act jurisdiction...." *Id.* at 184. The plaintiff never even alleged that the EPA had breached its grant agreement.

Relying upon *City of Manassas*, the district court in *Allegheny County Sanitary Authority v. E.P.A.*, 557 F.Supp. 419 (W.D.

Pa.1983) *aff'd* 732 F.2d 1167 (3d Cir.1984), held that, for the purposes of considering plaintiff's request for a preliminary injunction, its allegation that EPA officials had approved an improper Pennsylvania priority list was "a claim for misgovernment beyond the jurisdiction of the Court of Claims." 557 F.Supp. at 426. Although the court accepted the well pleaded material allegations of plaintiff's complaint as true and refused to dismiss the count in plaintiff's complaint directed against the EPA defendants, *id.* at 427, it denied plaintiff's request for a preliminary injunction. On appeal, the Third Circuit concluded that this denial did not constitute an abuse of discretion. 732 F.2d at 1177. It did not have to consider the district court's ability to hear a claim for permanent relief, however, because a "district court [may] properly exercise[ ] jurisdiction over [a] motion for a preliminary injunction, while postponing a jurisdictional ruling on [a] damages claim." *Coco Bros.*, 741 F.2d at 677 n. 1. Thus, this case is not governed by the *Allegheny County* appellate court opinion because the plaintiff, ACMUA, seeks permanent relief.

Moreover, the *Allegheny County* case is factually distinguishable in an important way. There, the plaintiffs alleged that the EPA officials had misapplied the complex criteria used to evaluate grant applications. *See* 33 U.S.C. § 1284; 40 C.F.R. § 35.835. Their complaint was virtually identical to the appeal which the plaintiff herein brought successfully to the EPA Board of Assistance Appeals. The ACMUA's present complaint, however, merely alleges that the EPA Regional Administrator improperly required a current, FY 1985 state certification. Unlike the *Allegheny County* court, we have not been asked to evaluate an EPA decision regarding the *propriety* of a state certification decision; we have only been asked, essentially, to determine the *existence* of a state certification decision (*i.e.*, whether a FY 1981 certification is still effective in 1985). We have not been asked to find that an official's determination, of whether a proposed facilities plan is likely to succeed in a cost-effective manner,

is not a discretionary act. *See* 33 U.S.C. § 1298(b).[11]

### C. The FWPCA "Citizen Suit" Withdraws Tucker Act Jurisdiction Over Nondiscretionary Acts

■ Assuming *arguendo* that a claim that one has been improperly denied a FWPCA grant would fall within the second noncontractual category of the Claims Court's exclusive Tucker Act jurisdiction, we find that the citizen suit provision of the FWPCA withdraws this jurisdiction when the claim is based upon the failure of an EPA official to perform a nondiscretionary act. *See Monsanto*, 104 S.Ct. at 2881. *Compare Amalgamated Sugar Co. v. Bergland*, 664 F.2d 818, 823–24 (10th Cir. 1981) (exclusivity of Claims Court's jurisdiction is not withdrawn by general federal question jurisdictional statute, 28 U.S.C. § 1331). Thus, we need not consider "the intriguing question of whether Congress may consistent with the Constitution and separation of powers principle, place exclusive equitable jurisdiction in an Article I Court to enjoin and compel activities of the executive branch." *Coco Bros.*, 741 F.2d at 679 n. 4.

The citizen suit provision of the FWPCA reads in relevant part:

(a) [A]ny citizen may commence a civil action ...

(2) against the [EPA] Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator....

The district courts shall have jurisdiction without regard to the amount in contro-versy or the citizenship of the parties, ... to order the Administrator to perform such act or duty....

33 U.S.C. § 1365.

The FWPCA does not specify or imply what acts or duties of the EPA Administrator are not discretionary.[12] Judicial decisions, however, have established that "discretionary" is not a term of art and is to be given its ordinary meaning. Thus, notwithstanding the fact that 33 U.S.C. § 1319(a)(3) states that the EPA Administrator *shall* issue abatement orders when he learns of a FWPCA violation, courts have held that the decision to issue such orders is discretionary. *See, e.g., Sierra Club v. Train*, 557 F.2d 485 (5th Cir.1977). Similarly, EPA's decisions regarding the issuance of effluent discharge permits are discretionary and, therefore, not reviewable via a citizen's suit. *District of Columbia v. Schramm*, 631 F.2d 854 (D.C.Cir. 1980); *Sun Enterprises, Ltd. v. Train*, 532 F.2d 280 (2d Cir.1976). *See also J.E. Brenneman Co. v. Schramm*, 473 F.Supp. 1316 (E.D.Pa.1976). These decisions of the EPA Administrator require application of scientific expertise to a particular set of circumstances. They seem, therefore, inevitably to involve an exercise of discretion. One must use discretion to decide "questions arising in a particular case not expressly controlled by fixed rules of law according to the circumstances and ... [one's] judgment." Webster's Third New International Dictionary 647 (14th ed. 1961).

■ The same cannot be said of the question of whether an EPA grant application must obtain current state certification. We believe that the FWPCA either requires current certification or it does not. The

---

**11.** In relevant part, § 1298 provides:
before the Administrator approves any grant to any ... agency for the erection ... [or] acquisition ... of any treatment works the Administrator shall determine that the facilities plan ... constitutes the most economical and cost-effective combination of treatment works over the life of the project to meet the requirements of this chapter....
33 U.S.C.A. § 1298(b) (West Supp.1985).

**12.** We shall not equate "not discretionary" with ministerial. Otherwise, given the existence of mandamus jurisdiction pursuant to 28 U.S.C. § 1361, we would hold that Congress added little, or perhaps nothing at all, to FWPCA enforcement by enacting 33 U.S.C. § 1365(a)(2). *See, e.g., Taylor v. United States Dept. of Labor*, 552 F.Supp. 728, 744 (E.D.Pa.1982).

concept of "[d]iscretion may be as elastic as a rubber-band but it, too, has a breaking point." *Birnbaum v. United States*, 588 F.2d 319, 329 (2d Cir.1978). The question of whether a particular project requires current state certification need not and, in fact, should not be left to the discretion of the EPA Regional Administrator. Thus, we hold that we have jurisdiction to do the following: (1) to order the EPA Administrator to determine whether the ACMUA grant application is entitled to priority over other such proposals in New Jersey's priority list, *see* 33 U.S.C. § 1284(a)(3); and (2) to decide whether the Regional Administrator properly construed § 1281(a)(3) as requiring the ACMUA project to be listed on the New Jersey FY 1985 project priority list. *See Manatee County, Fla. v. Train*, 583 F.2d 179 (5th Cir.1978).

### III.  The FWPCA Requires A Construction Grant Applicant To Obtain Current State Certification

■ The FWPCA does not explicitly state that in order to receive an EPA grant, a new construction project must have current state priority certification. It does provide, however, that supplementary grants, which reflect an increased percentage of the EPA's contribution to a project's total costs, shall be awarded "without regard to the fiscal year for which funds were [initially] authorized." 33 U.S.C. § 1282(b). Similarly, an EPA regulation explicates that "[a]ny project which is not contained on an accepted *current* priority list will not receive funding." 40 C.F.R. § 35.2015(e)(3) (1984) (emphasis supplied). A number of other regulations suggest that the fundable portion of priority lists are meant to be controlling or effective for only one fiscal year. *See, e.g., id.* at (e). Most importantly, the Act's entire funding structure presupposes annual state certification.

Congressional allotments for EPA grants are made on an annual basis. *Id.* at § 35.2010(a). Each year, states submit a new priority list to the EPA. Clearly, the ranking of projects in a priority list addresses the relative, not the inherent, merits of each. The perceptions held by the NJDEP, regarding what water treatment facilities are most needed, simply may change from year to year. The FWPCA sensibly permits these perceptions to be given effect.

In this case, for example, the FY 1981 NJDEP evaluation of the ACMUA proposed project may no longer accurately reflect the water treatment needs of New Jersey. The EPA Board of Assistance Appeals, it should be recalled, specifically premised its approval of the ACMUA project on the relatively low number of competing, proposed acquisitions. EPA Bd. op. at 8. Thus, funding the ACMUA project did not jeopardize funding for the new construction grants which the EPA favors. *See supra* p. 8 n. 3. The NJDEP may no longer view the ACMUA proposal in this light. If we prevented the NJDEP from *fully* participating in the FY 1985 evaluation process, by insisting that it abide by one of its FY 1981 conclusions, we would subvert the FWPCA funding scheme.

For the foregoing reasons, we hold that the EPA Regional Administrator properly interpreted the FWPCA and shall grant defendant's motion for summary judgment. Accordingly, plaintiff's request for an award of the costs of litigation shall be denied. The Court shall issue an appropriate order.