**COUNTY OF SUFFOLK, NEW YORK, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 570–86L.

United States Claims Court.

Jan. 25, 1990.

Jonathan Sinnreich, New York City, for plaintiff.

Christopher S. Vaden, with whom was Asst. Atty. Gen. Richard B. Stewart, Washington, D.C., for defendant.

OPINION

ANDEWELT, Judge.

I.

This action involves two related federal grant agreements between plaintiff, County of Suffolk, New York (Suffolk), and the Environmental Protection Agency (EPA), entered pursuant to the Federal Water Pollution Control Act (FWPCA), 33 U.S.C. § 1251 *et seq.* The grants cover the design and construction of a public waste water treatment facility known as the Suffolk County Southwest Sewer District No. 3. In its complaint, plaintiff seeks reimbursement of certain construction costs the EPA refused to reimburse on the ground that the costs were not "allowable" under the grant agreements and controlling EPA regulations.

This action is presently before the court on procedural and discovery motions filed by defendant. A central issue raised in defendant's motions relates to the proper

scope of this court's review of the EPA's decision not to pay the disputed construction costs. Plaintiff contends that the grant agreements constitute contracts, that the complaint alleges a breach of those contracts, that there is no provision in the contracts limiting the scope of a court's review of an allegation of breach of contract, and, therefore, that plaintiff is entitled to *de novo* review of its breach claim in this court. Consequently, plaintiff seeks broad discovery relating to the EPA's decision to disallow the disputed construction costs.

In response, defendant contends that the grant agreements do not constitute "traditional" or "normal" contracts, that the EPA spent considerable time and expertise evaluating the issue of allowable costs, and that the EPA's determination should be reviewed under the review standards articulated in the Administrative Procedure Act (APA), 5 U.S.C. § 704 *et seq.* Hence, defendant contends that this court's review should be limited to the administrative record and that the EPA's decision should be overturned only if it is found to be arbitrary, capricious, or not supported by substantial evidence. 5 U.S.C. § 704. Consistent with this position, defendant asks the court to file the administrative record and to prohibit any discovery beyond that necessary to determine the completeness of the record.

## II.

The two disputed federal grants are embodied in agreements entered originally in 1971 (No. C–36–0624 (the 624 grant)) and 1977 (C–36–1036–03 (the 1036 grant)), respectively. The percentage of construction costs covered by FWPCA grants has varied over the years. The current version of the FWPCA, which applies to the two grants here involved, provides that "[t]he amount of any grant for treatment works made under this chapter from funds authorized for any fiscal year beginning after June 30, 1971, and ending before October 1, 1984, shall be 75 per centum of the cost of construction thereof (as approved by the Administrator).…" 33 U.S.C. § 1282(a)(1).

The 624 and 1036 grant agreements would appear to satisfy all of the traditional requirements for an enforceable contract—an offer, an acceptance, and consideration passing between the parties. *See, e.g., Fincke v. United States,* 230 Ct.Cl. 233, 244, 675 F.2d 289, 295 (1982). As to the 624 grant, the document originally awarding the grant is entitled "OFFER AND ACCEPTANCE OF FEDERAL GRANT FOR SEWAGE TREATMENT WORKS UNDER 33 U.S.C. § 466 et seq." The document contains separate sections in which the EPA extends an offer and plaintiff accepts the offer. Section I, entitled "OFFER," is signed by an EPA representative and states the terms of the offer, including the total estimated project cost, the estimated project cost eligible for federal participation, and the amount of the federal grant offered.[1] In Section III, entitled "ACCEPTANCE," plaintiff's representative accepts the grant offer and agrees to a series of assurances and conditions listed in Sections I and II which gives the EPA a significant amount of control over the construction and post-construction operation of the proposed sewage treatment project. For example, during the construction process plaintiff assures that it will secure prior government approval before making any major alteration in the construction work or before making any change in the construction contract that would raise the cost of the project above the latest EPA-approved estimate. As to post-construction plant operation, plaintiff assures "[t]hat the facility will be maintained and operated in accordance with such requirements as the Commissioner

---

1. In addition, Section I states:

The amount of the Federal grant will not exceed the appropriate percentage of the estimated reasonable cost of the project, as established by law, or such dollar limitation so established; provided, that in the event the actual reasonable cost of any project, as determined by the Commissioner upon completion of construction, is less than the estimated reasonable cost upon which the grant offer is based, such actual cost shall be used to determine the amount of the Federal grant, and the grant shall be reduced as necessary to conform with the limitations hereinabove cited.

may publish from time to time concerning methods, techniques, and practices for economic, efficient, and effective operation and maintenance of treatment works."

Hence, the 624 grant involves an unambiguous offer, an unambiguous acceptance, and consideration passing between the parties. As to consideration, plaintiff received a commitment that the EPA would provide funds for the construction of the sewage project and the EPA received assurances that gave it significant control over construction and operation of the project.

The amount of the 624 grant was changed several times in subsequent amendments. The final amendment lists the eligible costs, item by item, and calculates the "TOTAL APPROVED ASSISTANCE AMOUNT" to be $227,129,453, 75% of the total eligible costs. A section entitled "OFFER AND ACCEPTANCE" describes the EPA's grant offer as "75% of all approved costs incurred up to and not exceeding $227,129,453."

The 1036 grant similarly is the product of an offer, acceptance, and consideration. The original grant generally tracks the form of the final amendment to the 624 grant. It lists the eligible costs and calculates the "Total Approved Grant Amount" to be $49,763,170, 75% of the total eligible costs. The section entitled "OFFER AND ACCEPTANCE" describes the offer as "75% of all approved costs incurred up to and not exceeding $49,763,170" and provides that the grant agreement is "subject to applicable [EPA] statutory provisions and grant regulations." Subsequent amendments increased the "TOTAL APPROVED GRANT AMOUNT" to $70,319,-630.

Given the existence of an offer, acceptance, and consideration, the two grant agreements on their face would appear to constitute enforceable contracts. Any possible dispute, however, as to the contractual nature of the government's obligations herein is resolved in 33 U.S.C. § 1283, which specifically provides that the government's approval of plans, specifications, and estimates for a treatment project re-sults in a contractual grant obligation. Section 1283(a) states, in pertinent part:

Each applicant for a grant shall submit to the Administrator for his approval, plans, specifications, and estimates for each proposed project for the construction of treatment works for which a grant is applied for.... The Administrator['s] ... approval of any such plans, specifications, and estimates shall be deemed a contractual obligation of the United States for the payment of its proportional contribution to such project.

Congress added Section 1283 in 1972 apparently because it perceived that the EPA Administrator lacked authority to enter contracts which bound the federal government to make grant payments over the life of a construction project. The Senate Conference Report describing this provision states:

Section 203 authorizes contract authority. The Administrator has power to commit the Federal Government to payment of its portion of treatment facilities when he approves an applicant's plans, specifications, and estimates.

Committee of Conference, Federal Water Pollution Control Act Amendments of 1972, S.Rep. No. 92–1236, 92d Cong., 2d Sess. 2 (1972), *reprinted in* 1972 U.S.Code Cong. & Admin.News 3668, 3788.

Plaintiff's claims for reimbursement did not exceed the "TOTAL APPROVED ASSISTANCE AMOUNT" of $227,129,453 for the 624 grant and the "TOTAL APPROVED GRANT AMOUNT" of $70,319,-630 for the 1036 grant. However, the EPA denied certain costs for each grant on the ground that they were not "allowable" costs under controlling EPA regulations.

### III.

■ Defendant acknowledges, as it must, that the grant agreements resulted in a contractual obligation. Defendant contends, however, that the agreements are not "traditional" or "normal" contracts and, hence, cannot give rise to a "traditional" breach of contract claim. But the case law upon which defendant relies simply does not support this position.

Defendant correctly notes that in *Missouri Health & Medical Org., Inc. v. United States,* 226 Ct.Cl. 274, 641 F.2d 870 (1981), the Court of Claims reviewed an agency decision not to issue an additional grant to the recipient of a previous federal grant under an arbitrary and capricious standard. But in *Missouri Health,* there was no formal agreement in which the government committed to extending such a grant. The sole issue in that case was whether the agency fulfilled its obligations under controlling regulations and internal procedures, and such issues are traditionally reviewed, if at all, under an arbitrary and capricious standard. *See, e.g., Julius Goldman's Egg City v. United States,* 214 Ct.Cl. 345, 556 F.2d 1096 (1977).

Defendant also relies upon *Bennett v. Kentucky Dep't of Educ.,* 470 U.S. 656, 105 S.Ct. 1544, 84 L.Ed.2d 590 (1985), which involves federal education grants to localities under Title 1 of the Elementary and Secondary Education Act of 1965, Pub.L. 89–10, 79 Stat. 27, as amended, 20 U.S.C. § 2701 *et seq.* Defendant focuses on the Court's rejection of the State of Kentucky's contention that because the grant program there involved was in the nature of a contract, any ambiguities with respect to Kentucky's obligations must be "resolved against the Federal Government as drafter of the grant agreement." The Court concluded that Kentucky's contentions "can be properly evaluated only against the background of the actual operation of Title 1," which resulted in the provision of federal funds but "expressly left the selection and development of particular projects to local control." *Bennett,* 470 U.S. at 667, 105 S.Ct. at 1551. In rejecting the State of Kentucky's contention that in such a setting ambiguities in the grant requirements "should invariably be resolved against the Federal Government as drafter of the grant agreement," the Court stated:

Although we agree with the State that Title I grant agreements had a contractual aspect, the program cannot be viewed in the same manner as a bilateral contract governing a discrete transaction. Unlike normal contractual undertakings, federal grant programs originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desireable public policy. Title 1, for example, involved multiple levels of government in a cooperative effort to use federal funds to support compensatory education for disadvantaged children. The Federal Government established general guidelines for the allocation and use of funds, and the States agreed to follow these guidelines in approving and monitoring specific projects developed and operated at the local level. Given the structure of the grant program, the Federal Government simply ₜcould not prospectively resolve every possible ambiguity concerning particular applications of the requirements of Title I.

*Id.* at 669, 105 S.Ct. at 1552 (citations omitted).

The reasoning of *Bennett* simply does not suggest that plaintiff is not entitled to maintain a breach of contract action under the FWPCA. First, in *Bennett,* the Court did not conclude that the grant agreement there involved was not a contract or that a breach of contract action could not lie in the event the government did not fulfill its obligations under the agreement. Rather, the pertinent issue before the Court was whether to interpret certain ambiguities "against the Federal Government as drafter of the grant agreement." The Court held simply that unlike "normal" government contracts, the terms of Title I grants should not "invariably" be interpreted against the federal government. Second, the Court found crucial "the background of the actual operation" of the grant system. The FWPCA system apparently differs significantly from the operation of Title I. Unlike grants under Title I, grants under the FWPCA cover specific projects on which estimates of final costs are determined by the EPA prior to entry into the grant agreements. This renders the FWPCA system much more like a traditional "bilateral contract governing a discrete transaction." *Id.* Third, in any event, Title I apparently does not contain a statutory provision equivalent to 33 U.S.C. § 1283, which unequivocally indicates Con-

gress' intent that the EPA be contractually obliged to make the grant payments once it approves an applicant's plans, specifications, and estimates.

Next, defendant cites a line of cases for the proposition that grants involve sovereign actions for which the government cannot be sued. *See, e.g., City of Manassas Park v. United States,* 224 Ct.Cl. 515, 521, 633 F.2d 181, 184, *cert. denied,* 449 U.S. 1035, 101 S.Ct. 611, 66 L.Ed.2d 497 (1980). ("When the government prescribes how grant money is used, it is performing sovereign acts for which it is not liable on a contract theory.... The claim ... is one for misgovernment excluded from Tucker Act jurisdiction....") But in *City of Manassas Park,* the court recognized that the grant there involved was a "contract enforceable [in the Court of Claims]" and that the government was bound "by its express undertakings" in that contract. *Id.* at 520, 633 F.2d at 184. In any event, however, by classifying the government's obligation as contractual in Section 1283, Congress must be deemed to have waived sovereign immunity and authorized suit under the Tucker Act in the event the EPA failed to fulfil its contractual obligations.

## IV.

■ The Claims Court typically considers allegations that a party did not fulfill its obligations under a contract on a *de novo* basis. *See, e.g., Northbridge Electronics v. United States,* 195 Ct.Cl. 453, 457–58, 444 F.2d 1124, 1127 (1971); *Tecon Corp. v. United States,* 188 Ct.Cl. 15, 26, 411 F.2d 1262, 1268 (1969). However, the parties can limit the scope of the court's inquiry into any breach claim by including appropriate limiting provisions in the contract. The grants in issue here were at one time subject to a regulation that so limited the court's scope of review. Subpart J (40 C.F.R. § 30.1100 *et seq.*), entitled "Disputes," which applied from 1975 through 1983, provided, in pertinent part:

The decision of the Administrator or his duly authorized representative ... shall be final and conclusive unless determined by a court of competent jurisdiction to have been fraudulent or capricious, or arbitrary, or so grossly erroneous as to imply bad faith, or not supported by substantial evidence.

40 C.F.R. § 30.1120 (1975).

However, in 1984 the EPA, apparently without prior notice or comment, eliminated Subpart J and replaced it with a new Subpart L (40 C.F.R. 30.1200 *et seq.*), which did not contain any limitation on the scope of a court's review of the Administrator's decision. In addition, Subpart L significantly limited the contractor's ability to present new evidence during the internal appeals process within the EPA; it abrogated the grantee's previous right during the internal EPA appellate process to offer testimony, cross examine government witnesses, and examine exhibits and documents submitted into the record.

Defendant does not dispute that Subpart L rather than Subpart J controls herein. However, defendant contends, in effect, that in adopting Subpart L, the EPA intended to maintain a limited scope of court review by having the review standards in the APA apply. 5 U.S.C. § 706 *et seq.* To support this position, defendant points to the use of the term "final Agency action" in Subpart L, a term that also is used in the APA. (Subpart L provides that the decision of the Assistant Administrator constitutes "final Agency action" and further administrative review within the EPA is discretionary. 40 C.F.R. §§ 30.1220, 30.-1225.) But the APA applies only with respect to "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. For the reasons explained above, since plaintiff can attack the EPA's decision in this court in a breach of contract action under the Tucker Act (28 U.S.C. § 1491), there is an "adequate remedy at law" and pursuant to its terms, the APA would not apply.[2]

2. The concept of "finality" of agency action is relevant to the distinct issue of the ripeness of an agency decision for judicial consideration. Courts require that agency action be "final" pri-

or to court review to avoid judicial intervention in disputes that may still be resolved by the agency itself. *See, e.g., Nor–Am Agricultural Products, Inc. v. Hardin,* 435 F.2d 1151 (7th

To support its contention that Subpart L makes the APA standards of review applicable herein, defendant also relies on a statement in the September 30, 1983, Federal Register that the newly adopted Subpart L will "[d]evelop a good administrative record to support the Agency's final decisions." 48 Fed.Reg. 45,061 (1983). But this Federal Register statement is not a part of Subpart L and is not otherwise incorporated as a part of the contractual agreement between the parties. Moreover, the statement is ambiguous in that "a good administrative record" certainly would be useful in supporting an agency's decision even if court review were not limited to that record.

### Conclusion

In sum, for the reasons explained above, this action is properly characterized as a breach of contract action within this court's Tucker Act jurisdiction. Since defendant has not cited any provision in the contracts or controlling regulations that limits the scope of this court's review of such a breach claim, the scope of this court's review here will be the same as it would be for any other federal contract.

The parties shall consider defendant's pending procedural and discovery motions in light of this decision. If the parties cannot reach an agreement as to how to proceed, on or before February 26, 1990, they shall inform the court in a joint status report as to the issues that remain in dispute.

IT IS SO ORDERED.

Cir.1970), *cert. dismissed,* 402 U.S. 935, 91 S.Ct. 1399, 28 L.Ed.2d 870 (1971). But the fact that an agency decision is "final agency action" says nothing, *per se,* about the scope of a court's subsequent review of that decision.