**COUNTY OF SUFFOLK, NEW YORK, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 570–86L.**

United States Claims Court.

July 29, 1992.

Jonathan Sinnreich, New York City, for plaintiff.

Christopher S. Vaden, Jon M. Lipshultz, Washington, D.C., for defendant. Carol Cowgill and Meyer Scolnick, Environmental Protection Agency, of counsel.

## OPINION

ANDEWELT, Judge.

This action involves two related federal grant agreements[1] between plaintiff, County of Suffolk, New York (Suffolk), and the United States Environmental Protection Agency (EPA) covering the design and construction of a waste water treatment project known as the Suffolk County Southwest Sewer District No. 3 (the Project). The agreements, entered pursuant to the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq., obliged the EPA to pay a fixed percentage of "allowable" costs for the Project. In this action, plaintiff contends that the EPA improperly disallowed certain of the costs plaintiff incurred during construction of the Project. This action is presently before the court on cross-motions for partial summary judgment. For the reasons set forth below, defendant's cross-motion is granted in part.

### I.

The first issue to address is the weight to be given to the EPA's determination that the costs in dispute were not allowable. Defendant previously had argued unsuccessfully that review of the EPA's determination of allowable costs should be conducted under the standards set forth in the Administrative Procedure Act (APA), 5 U.S.C. § 704 et seq., for review of agency action, i.e., that the court must limit its inquiry to the administrative record and may not overturn the EPA's determination unless it is found to be arbitrary, capricious, or not supported by substantial evidence. This court rejected applicability of the APA standard in an opinion authorizing plaintiff to conduct discovery beyond the administrative record. County of Suffolk v. United States, 19 Cl.Ct. 295 (1990) (Suffolk I).

In Suffolk I, the court explained that the grant agreements satisfy all of the traditional requirements for an enforceable contract (i.e., an offer, an acceptance, and consideration passing between the parties) and, therefore, the parties' respective responsibilities should be evaluated based on a breach of contract analysis. As to that analysis, the court explained that breach of contract allegations generally are evaluated by this court on a de novo basis unless the parties limit the scope of this court's inquiry through the inclusion of limiting provisions in the contract.[2] Id. at 299.

---

1. These two grant agreements were entered originally in 1971 (No. C–36–0624 (the '624 grant)) and 1977 (No. C–36–1036–03 (the '1036 grant)), respectively.

2. The court recognizes that it can be argued to be a waste of valuable resources when an agency with expertise conducts an extensive factual inquiry and comes to certain factual conclusions and then a reviewing court proceeds to create an entirely new record and makes its own factual determinations with no deference to the findings of the agency. But this concern cannot be controlling because this court is not free to define the proper standard of review based on the court's personal perceptions as to the inherent efficiencies involved. The court initially must resolve the question of whether the parties entered into a binding contract or whether unilateral federal agency action is involved. If, as here, a contract is involved, the court is obliged to evaluate the plaintiff's breach claim under the same standards that would apply to any other breach of contract claim. The court must look to the wording of the contract and determine how the parties defined their respective rights and obligations, and then assess whether any breach of those rights and obligations occurred. In the course of defining their respective rights and obligations, the parties to the contract are free to mandate that an agency determination be given a certain level of deference in any court challenge. (But under the Wunderlich Act, judicial review of a government contract cannot be totally precluded. See 41 U.S.C. §§ 321 and 322.) Thus, to the extent the parties believe that APA-type review standards are appropriate, they can include a provision to that effect in their contract. Therefore, the crucial question when assessing the standard of review for this court in a contract action is whether the parties specified in, or incorporated into, their contract any provision that has the effect of obliging deference to the agency decision or otherwise limiting judicial review. If no such limitation is included, the parties have every right to expect, and the court is

Here, agency regulations incorporated into the contract had at one time specified a limited standard for judicial review of the agency's determinations, but those regulations subsequently were modified to elimi- · nate the specific reference to the judicial review standard. At the conclusion of *Suffolk I,* this court explained: "Since defendant has not cited any provision in the contract or controlling regulations that limits the scope of this court's review of such a breach claim, the scope of this court's review here will be the same as it would be for any other federal contract." *Id.* at 300.

■ In its cross-motion, defendant points to a provision in the '624 grant that would appear to limit the scope of judicial review of the EPA's determination on cost allowability. The '624 grant provides, in pertinent part:

> The amount of the Federal grant will not exceed the appropriate percentage of the estimated reasonable cost of the project, as established by law, or such dollar limitation so established; provided, that in the event the actual reasonable cost of any project, as determined by the Commissioner [of the Federal Water Pollution Control Administration] upon completion of construction, is less than the estimated reasonable cost upon which the grant offer is based, such actual cost shall be used to determine the amount of the Federal grant, and the grant shall be reduced as necessary to conform with the limitations hereinabove cited.

Thus, the '624 grant first delegates to the Commissioner the responsibility of making the determination as to what is the actual reasonable cost ("the actual reasonable cost ... *as determined by the Commissioner*" (emphasis added)), and then mandates that this actual reasonable cost as determined by the Commissioner be used in determining the total amount of the federal grant, which in turn controls the amount that plaintiff is entitled to receive under the contract. The Federal Water Pollution

Control Administration later became part of the EPA and the authority of the Commissioner was vested in the Administrator of the EPA.

The Court of Claims has previously addressed analogous contractual provisions where the parties to a contract agree to give broad discretion to one of the parties to make a crucial factual determination under the contract. *See e.g., John Reiner & Co. v. United States,* 325 F.2d 438, 163 Ct.Cl. 381 (1963), *cert. denied,* 377 U.S. 931, 84 S.Ct. 1332, 12 L.Ed.2d 295 (1964); *Knotts v. United States,* 121 F.Supp. 630, 128 Ct.Cl. 489, 491 (1954). In *Knotts,* the court explained:

> In innumerable cases it has been held that where discretion is conferred on an administrative officer to render a decision, this decision must be honestly rendered, and that if it is arbitrary or capricious, or rendered in bad faith, the courts have power to review it and set it aside. This court has this question presented to it constantly in cases arising under Government contracts, where the contracting officer and the head of the department are given the power to render final decisions on questions of fact. Both this Court and the Supreme Court have many times held that if the decision is arbitrary or capricious or so grossly erroneous as to imply bad faith, it will be set aside. *See, e.g., Burchell v. Marsh,* 17 How. 344, 349 [15 L.Ed. 96 (1854)]; *Kihlberg v. United States,* 97 U.S. 398 [24 L.Ed. 1106 (1878)]; *United States v. Gleason,* 175 U.S. 588, 602 [20 S.Ct. 228, 233, 44 L.Ed. 284 (1900)]; *Ripley v. United States,* 223 U.S. 695, 701 [32 S.Ct. 352, 355, 56 L.Ed. 614 (1912)].

121 F.Supp. 630, 128 Ct.Cl. at 491.

The EPA determined the "actual reasonable cost" pursuant to regulations which established the procedures for determining allowability of costs incurred by grant recipients.[3] In view of the pertinent wording of the '624 grant and the case law cited above interpreting analogous contract pro-

---

obliged to conduct, a *de novo* analysis of a breach of contract claim.

**3.** *In re Suffolk County, New York,* No. 02–84–AD21, slip op. at 12 (E.P.A. Region II Jan. 28, 1986) (determination of the Region Administrator).

visions, this court should not set aside the EPA's determination as to the "actual reasonable cost" unless that determination "is arbitrary or capricious or so grossly erroneous as to imply bad faith." *Id.*

## II.

In its complaint, plaintiff attacks the EPA's determination not to allow certain costs plaintiff incurred during the construction of the Project. In their respective cross-motions, the parties each seek summary judgment as to certain of these disputed costs. After oral argument, the parties reached a tentative settlement of all but one of the issues raised in the cross-motions. The remaining issue involves the EPA's disallowance of $3,219,662 in costs relating to Contract III–7 which plaintiff entered pursuant to the '624 grant to cover construction of a portion of the intercepting sewers, trunks, and laterals for the Project. Defendant moves for summary judgment on this issue but plaintiff contends that trial is necessary to assess the correctness of the EPA's disallowance of these costs.

■ Summary judgment is not a "disfavored procedural shortcut" but rather "an integral part of the Federal Rules as a whole." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). A grant of summary judgement is appropriate where there is no genuine issue as to any material fact (*i.e.*, a fact that may affect the outcome of the suit) and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party has the initial burden of establishing the absence of any genuine issue of material fact. If that burden is met, the burden shifts then to the nonmoving party. *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562–63 (Fed.Cir.1987). To survive summary judgment, the nonmovant must demonstrate either the existence of a genuine dispute as to a material fact or that it is entitled to judgment as a matter of law on the undisputed facts. RUSCC 56. To demonstrate the existence of a dispute as to a material issue of fact, the nonmoving party must present sufficient evidence to enable the trier of fact reasonably to find in favor of the nonmoving party as to the existence of that material fact. *Liberty Lobby*, 477 U.S. at 249, 106 S.Ct. at 2510. RUSCC 56(f) defines the nonmovant's burden, as follows:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of such party's pleading, but such party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If such party does not so respond, summary judgment, if appropriate, shall be entered against such party.

## III.

The dispute as to Contract III–7 focuses on plaintiff's failure to award the contract to one of the bidders, Hendrickson Brothers, Inc. (Hendrickson). Bids on Contract III–7 originally opened on October 21, 1976. Hendrickson bid $6,060,000, nearly $1 million below the second lowest bid and approximately $1.5 million below the engineer's estimate. Hendrickson accompanied its bid with the required bond. Under New York law, N.Y.Gen.Mun.L. § 105 (McKinney 1986) (hereinafter Section 105), Hendrickson was permitted, without prejudice, to withdraw its bid and bond any time after 45 days after receipt of the bid, so long as no award was previously made. Section 105 provides:

[W]henever as a condition precedent to the reception or consideration of a bid ... a deposit of a certified check, money, bonds or other obligations is required, a person or corporation submitting a bid may withdraw the same if no award of the contract be made within forty-five days after the receipt thereof, and upon such withdrawal such deposit shall be forthwith returned.

Consistent with this statute, Section I–15 of the specifications of the "Information to Bidders" for Contract III–7 provides: "Within 45 days after the opening of the

bids, [Suffolk] will accept one of the bids on each contract for which bids have been received or will reject all proposals." As to the requirements for acceptance and award, Section I–15 provides, in part, that "acceptance of each bid and notice of award will be in writing signed by an officer of [Suffolk] and mailed to the address designated in the Proposal." Section I–11(d) provides that "[Suffolk] will not be bound by the award nor shall any work be performed on account of the proposed contract until the contract has been fully approved, executed and delivered."

Plaintiff did not make a binding acceptance or award of the contract or reject all of the proposals within the 45–day statutory and contract periods.[4] On January 18, 1977, 89 days after the bid opening, Hendrickson notified plaintiff that it was withdrawing its bid. Plaintiff subsequently resolicited the contract and ultimately awarded it to another bidder at a price of $9,279,-662. The difference between Hendrickson's bid and the subsequent contract award is the $3,219,662 now in dispute.

Defendant seeks summary judgment on the grounds that the EPA correctly refused to allow the additional costs of $3,219,662. Under applicable regulations, to be "allowable," a cost must be "reasonable," *i.e.*, not exceed the cost that would have been incurred by an ordinarily prudent person.[5] Defendant contends that plaintiff acted unreasonably and imprudently in failing to award Hendrickson the contract before Hendrickson withdrew its bid. Defendant argues that Hendrickson presented a highly attractive bid and plaintiff reasonably should have acted expeditiously and taken the steps necessary to make the award

before Hendrickson withdrew its bid, 89 days after bid opening. Defendant further contends that plaintiff's failure to make a timely award to Hendrickson violated plaintiff's express assurance in the '624 grant "that adequate methods of obtaining competitive bidding will be employed prior to awarding the construction contract, and that the award of the contract will be made to the responsible bidder submitting the lowest acceptable bid."

■ In its response to defendant's cross-motion, plaintiff does not rely so much upon a recitation of specific facts that are material and in dispute, but rather primarily presents additional facts and contends that when all of the facts are viewed in their totality, a trial is necessary because plaintiff arguably could be found to have acted reasonably and prudently in handling Hendrickson's bid. To support its position that it acted reasonably, plaintiff contends that rather than plaintiff being at fault for the delay in the award to Hendrickson, the delay was the fault of the EPA, the Suffolk County legislature, and Hendrickson. In addition, plaintiff contends that in any event, plaintiff could not reasonably have foreseen that New York state courts would interpret Section 105 so as to permit Hendrickson to withdraw its bid on January 18, 1977.[6]

## IV.

■ Plaintiff contends that it was the EPA's fault that plaintiff could not award the contract within the 45–day statutory and contract periods. EPA officials had informed plaintiff that it was not authorized to enter any contracts absent written

---

**4.** The sufficiency of plaintiff's actions in this regard were litigated in a New York state action between Hendrickson and plaintiff. That action is discussed at length in Section VII, *infra.*

**5.** The parties have agreed that the standard for reasonableness to be applied is the standard set forth in 41 C.F.R. § 1–15.201–3 (1972), which in substance requires plaintiff to act as "an ordinarily prudent person in the conduct of competitive business."

**6.** Plaintiff contends that the issue before the court—the reasonableness of plaintiff's bid man-

agement procedures—is essentially an issue of negligence and that issues of negligence must be determined based on the totality of circumstances and should seldom be resolved by summary judgment. But summary judgment is available for issues of negligence as it is for any other claim. The existence of a large number of facts or a requirement that the facts be considered in their totality does not render summary judgment inappropriate. The crucial issue under RUSCC 56 is whether there is any genuine dispute between the parties as to an issue of material fact. If no such dispute exists, then summary judgment is appropriate.

authorization from the EPA. But, while Suffolk apparently requested authority to issue Contract III–7 to Hendrickson on November 8, 1976 (18 days after bid opening), the EPA did not send a written authorization until December 2, 1976 (42 days after bid opening), and plaintiff did not receive the written authorization until December 6, 1976, one day after the 45–day contract period had passed.

But the EPA's actions can hardly excuse plaintiff's failure to award the contract prior to Hendrickson withdrawing its bid on January 18, 1977. First, plaintiff reasonably should have viewed the 45–day period as important because Section 105 permitted withdrawal of the bid thereafter without penalty and, in addition, because plaintiff had agreed to "accept one of the bids" within 45 days after the opening of the bids. In this setting, plaintiff potentially could have taken the necessary steps to assure that it received the EPA's written authorization within the 45–day period. The EPA had given plaintiff verbal authorization on November 24, 1976, and all that apparently remained was forwarding of the paperwork. That paperwork was completed and the authorization mailed on December 2, 1976. Certainly, through perseverance, including nothing more novel than the use of a messenger, plaintiff could have secured receipt of that authorization before the end of the 45–day period.

In any event, however, the 45–day period did not turn out to be crucial. While New York law permitted Hendrickson to withdraw its bid and secure return of its bond if no award was made within 45 days, Hendrickson did not take such action until January 18, 1977, 89 days after bid opening and 43 days after plaintiff received the EPA's written authorization. Therefore, even if the EPA's delay in getting written authorization to plaintiff constituted a viable excuse for plaintiff not binding Hendrickson to the contract within 45 days of bid opening, that delay cannot reasonably excuse plaintiff's failure to execute the contract during the additional 44 days.

## V.

■ Next, plaintiff attempts to find support for its own delay in awarding the contract in the actions of its own county legislature. While plaintiff requested authorization of the necessary funds for Contract III–7 from Suffolk County's budget director on November 4, 1976 (14 days after bid opening), a legislative resolution authorizing the expenditure was not prepared until November 23, 1976. Pursuant to Suffolk County's legislative rules, the bill had to be "laid on the table for two weeks" for consideration and review and the authorization was not approved until December 7, 1976, two days after expiration of the 45–day period. But the Suffolk County legislature is a part of plaintiff, and plaintiff can hardly rely upon the delays of its own legislative body to excuse its delay in awarding the contract. Prudent and sound business practice demanded that plaintiff take appropriate steps in advance to ensure that internal legislative delays not result in the loss of beneficial bids and that plaintiff could satisfy its contractual obligation to accept an offer or reject all bids within 45 days of bid opening. Indeed, expedited consideration of bills "laid on the table" with no two-week delay was possible had the county executive submitted a "Certificate of Necessity," but the county executive made no such request.

In any event, as noted above, the 45–day period turned out not to be crucial because Hendrickson did not withdraw its bid until January 18, 1977. Since plaintiff secured legislative authorization on December 7, 1976, plaintiff had 42 days thereafter before Hendrickson withdrew its bid. As will be shown below, 42 days was ample time for plaintiff to take the additional steps necessary to award the contract and bind Hendrickson to its bid.

## VI.

■ Next, plaintiff places blame for its failure to enter a binding contract before Hendrickson withdrew its bid on Hendrickson's failure to supply plaintiff with the required copies of insurance certificates. Plaintiff had informed Hendrickson in a

November 4, 1976, letter that it was its "intention" to award the contract to Hendrickson, but plaintiff cautioned that the letter did not constitute a formal award. The November 4 letter stated that "[d]ue to the procedures we must follow, however, we are unable to make a formal award at this time." On November 8, 1976, plaintiff sent Hendrickson the unsigned contract and related bonding forms,[7] and on December 9, 1976, Hendrickson returned the contract signed, together with the required bonds. The "Information to Bidders" in the contract required Hendrickson to procure specified types of insurance and to file proof of insurance "at the time of the contract." Section I-17 provides:

INSURANCE

(a) The General Terms and Conditions require the Contractor to maintain in force during the performance of the work, policies of Workmen's Compensation and Employers' Liability Insurance and Bodily Injury Liability and Property Damage Insurance covering the operations of the Contractor and the use of all motor vehicles employed by the Contractor. Original policies, or properly executed conformed copies, evidencing the fact that the Contractor has procured the required insurance *must be filed with the Owner at the time of the Contract.*

(Emphasis added.)

Hendrickson periodically submitted to plaintiff various proofs of insurance and presented the last of the required insurance certificates on January 18, 1977, which was after Hendrickson had submitted the contract, signed by Hendrickson, to plaintiff but before plaintiff had returned the contract to Hendrickson with the required Suffolk signatures. On that same day, January 18, 1977, Hendrickson notified plaintiff that it was withdrawing its bid.

Plaintiff contends that "[o]nly upon receipt of the final insurance certificates could the County complete execution of the contract," and, therefore, plaintiff was prevented from completing contract execution until January 18, 1977, the same day Hendrickson withdrew its bid. But this argument misreads Section I-17. Section I-17 only requires the filing of the certificates "at the time of the contract," not before. As of January 18, 1977, there was no contract because plaintiff had failed to take the steps necessary under Section I-11(d) to create a binding agreement with Hendrickson, *i.e.*, approval, execution, and delivery of the contract. Had plaintiff executed and delivered the signed contract before Hendrickson withdrew its bid, a binding contract would have existed at that time (*i.e.*, at the time of the contract), and Hendrickson would have been obliged to submit the last of the insurance documents. In this regard, Section I-17 creates obligations only on the contractor and does not contain any conditions on plaintiff's entering the contract. Therefore, without any inconsistency with Section I-17, plaintiff could have executed the contract and delivered it to Hendrickson, and thereby bound Hendrickson to its bid.[8]

Moreover, Section I-18 of the bid specifications clearly indicates that the parties envisioned the contractor being bound to its bid prior to submission of the insurance certificates. Section I-18 provides:

7. Plaintiff raised concerns that Hendrickson had bid virtually nothing for certain line items included in the bids (known as "penny bids"), but Hendrickson provided sufficient explanation for its bidding on November 23, 1976. Plaintiff asserts that upon satisfactory resolution of this question, plaintiff effectively "accept[ed]" Hendrickson's bid. However, plaintiff misconstrues the meaning of the term "accept" as used in contract law. The fact that Hendrickson may have satisfied plaintiff's concerns over the substance of the "penny bids" issue does not mean that plaintiff accepted the bid offer so as to bind itself and Hendrickson to the terms of the bid.

8. Indeed, plaintiff's proposed interpretation of Section I-17 would create an anomalous result in that in cases where Section 105 applies, the government agency would not be able to hold a contractor to its bid. For example, if a contractor decided that its bid was too low or that it no longer wanted the job, the contractor simply could delay submitting its insurance certificates until after the 45-day period had run and then withdraw its bid. Section I-17 cannot reasonably be interpreted to mandate such a result.

FAILURE TO EXECUTE CONTRACT

(a) If the successful bidder shall fail to furnish the required bonds and insurance policies and to execute the contract in accordance with instructions contained in the Notice of Award, he shall be deemed to have refused to enter into the contract and to have waived all claim to the work and he shall pay the owner all damages sustained by the Owner as a consequence of his failure to enter into the contract including ... all loss from delay and interference with the Owner's construction program and the difference between the amount of the successful bidder's proposal and the amount for which the Owner may contract with another to perform the work covered by said proposal, if the latter be in excess of the former. The Surety on the bid bond shall be liable for such damages to the extent of the principal amount of the bid bond. Where the security deposited is a check, the Contractor shall be liable for such damages to the extent of the amount of the check.

Hence, had plaintiff acted prudently, it would have had ample opportunity to protect its interest in Hendrickson's bid. For example, plaintiff could have delivered to Hendrickson a signed contract with an unqualified notice of award rather than merely an unsigned contract. Under Section I–18, Hendrickson, in effect, would then have been obliged to sign the contract and supply the needed insurance certificates. By taking such action, plaintiff would not have risked incurring uninsured liabilities because plaintiff could have precluded any work under the contract simply by withholding the notice to proceed until the contractor satisfied all of the insurance requirements. Thus, Hendrickson's failure to submit the insurance certificates did not prevent plaintiff from awarding the contract prior to Hendrickson's withdrawal of its bid.

VII.

■ Next, plaintiff contends, in effect, that it should not be found to have acted imprudently in handling Hendrickson's bid because it was not reasonably foreseeable that Section 105 would be interpreted in such a way as to permit Hendrickson to withdraw its bid on January 18, 1977. The material facts with respect to this argument are as follows.

After plaintiff received the contract signed by Hendrickson, it forwarded the contract for signature to Suffolk County's attorney and its comptroller and to the Commissioner of the Suffolk County Department of Environmental Conservation. The Commissioner signed the contract on December 21, 1976. On January 18, 1977, Hendrickson informed plaintiff that its bid was void and that it would no longer stand behind it.[9]

However, plaintiff did not agree that the bid was void. On or about January 19, 1977, the Suffolk County executive signed the contract and along with a letter dated January 21, 1977, plaintiff delivered the contract to Hendrickson. In that letter, plaintiff took the position that Hendrickson did not have the option under the agreement to treat its bid as void. Hendrickson refused to perform the work under the contract, and on February 2, 1977, Hendrickson brought suit in the New York Supreme Court seeking return of its bid bond and insurance certificates.

Plaintiff initially prevailed at the trial level. *Hendrickson Bros., Inc. v. County of Suffolk*, No. 2217–77 (Suffolk County S.Ct. Feb. 25, 1977) (order dismissing the petition). The trial court acknowledged that under Section 105, Hendrickson could withdraw its bid if an award of contract was not made within 45 days after the bid opening. But the court concluded that Hendrickson's January 18, 1977, withdraw-

---

9. In its January 18, 1977, letter to the Commissioner, Hendrickson stated:

No notice of bid, or notice of award has been received although the 45 day period has long since expired as provided in Section I–15 entitled "Acceptance and Award."

Accordingly, Hendrickson Bros., Inc., hereby advises you that the failure to accept our bid within the required 45 day period has rendered the bid void and of no further force and effect.

al came too late because the contract had been fully executed and awarded on December 21, 1976. The court based its conclusion on the Commissioner's signature on the contract dated that day and on someone having inserted that date in the agreement so that the agreement read: "This agreement, made the *21st* day of *December, 1976.*"

On appeal, the Appellate Division of the New York Supreme Court overruled the trial court's decision and concluded that there had not been an award of the contract on December 21, 1976. *Hendrickson Bros., Inc. v. County of Suffolk,* 58 A.D.2d 602, 395 N.Y.S.2d 236 (1977). The Appellate Division concluded that delivery of the signed contract was a "condition precedent" to an award, *id.* at 603, 395 N.Y.S.2d at 238, and since delivery did not occur until January 21, 1977, three days after plaintiff received Hendrickson's letter of withdrawal, the withdrawal was effective.

The Appellate Division gave two distinct reasons for its conclusion. First, the court concluded that under New York law, the court was obliged to give effect to the intent of the parties and that "[i]t was clearly the intention of the parties that the county would not become bound until a contract was fully authorized, executed, and delivered by it." *Id.* To demonstrate this intent, the court relied upon Section I–11(d) and I–15 cited above.[10] Second, the court explained its alternative rationale for concluding that the contract had not been awarded on December 21, 1976, as follows:

> Apart from the fact that delivery was stipulated to be a condition precedent, a communication of acceptance was required (see *White v. Corlies,* 46 N.Y. 467;

*Cortland Asbestos Prods. v. J & K Plumbing and Heating Co.,* 33 A.D.2d 11, 304 N.Y.[S.]2d 694 [(1969)]; *Moody Engineering Co. v. Board of Educ.,* 205 App.Div. 522, 199 N.Y.S. 689 [(1923)]).

58 A.D.2d at 603, 395 N.Y.S.2d at 238. The Appellate Division's decision in Hendrickson's favor was ultimately affirmed by the New York Court of Appeals, 51 N.Y.2d 1003, 435 N.Y.S.2d 981, 417 N.E.2d 93 (1980).

Plaintiff contends, in effect, that it acted prudently in that it was not reasonably foreseeable that the New York courts would interpret Section 105 to permit Hendrickson to withdraw its bid. Plaintiff argues that there was scant precedent interpreting Section 105 and that the ultimate ruling was novel and unexpected. But plaintiff has not submitted any evidence to suggest that at the time it had considered the ramifications of Section 105, it had concluded that the acts it already had taken would be sufficient acts to produce an "award" which would preclude a bid withdrawal under Section 105.[11] In any event, however, regardless of plaintiff's subjective conclusions, from an objective perspective the Appellate Division's decision is fully supported by the contract provisions and case law upon which it relies and, hence, was reasonably foreseeable. Indeed, in view of these sources, not only can it be said that the court's interpretation of Section 105 was sufficiently possible that a reasonably prudent person would have taken appropriate steps in anticipation of it, but, indeed, the decision was sufficiently likely that it could have been predicted with a reasonable level of confidence.[12]

---

10. As noted above, Section I–11(d) provides: "[Suffolk] will not be bound by the award nor shall any work be performed on account of the proposed contract until the contract has been fully approved, executed and delivered."

11. Indeed, the evidence indicates to the contrary. Plaintiff specifically notified Hendrickson in its November 4, 1976, letter that there was not yet any formal award, and there is nothing in the evidence cited to indicate that prior to January 18, 1977, plaintiff ever sent a letter to Hendrickson indicating that a final award had been made.

12. Plaintiff relies upon *Hempstead v. United States Trucking Corp.,* 31 Misc.2d 419, 219 N.Y.S.2d 637 (Nassau County S.Ct. 1961). However, *Hempstead* merely stands for the proposition that a bidder who agrees to be bound by one form of acceptance (issuance of a town purchase order) can become bound by an acceptance in a different form (passage of a town board resolution of acceptance) which, under the circumstances, amounts to the same thing. While *Hempstead,* applied to the instant facts, arguably could have supported "delivery" of the contract by messenger, rather than by mail as specified in Section I–15, it hardly can support

Moreover, a contrary decision by the New York courts would seem to undermine the purpose behind Section 105, which is to protect bidders who are required to submit deposits "from being denied the use of their funds for an unduly long period of time." *A.R. Fuels, Inc. v. New York*, 72 A.D.2d 517, 518, 420 N.Y.S.2d 894, 895 (1979), *aff'd* 49 N.Y.2d 749, 426 N.Y.S.2d 265, 402 N.E.2d 1166 (1980). Herein, as the Appellate Division explained, under the pertinent terms of the "Information to Bidders," plaintiff was not bound by a signed contract until the contract was delivered to Hendrickson. Hence, plaintiff is arguing, in effect, that there can be an "award" of the contract under Section 105 even though there had been no formal notice of award and even though the public agency soliciting the bids had not taken the steps necessary to bind itself to the contract. But such a definition of "award" clearly could result in a bidder being denied the use of its funds for "an unduly long period." As the instant facts show, by taking certain internal actions, a public agency could deny a bidder the use of its funds long beyond 45 days, without ever legally committing itself to award the contract. Indeed, the public agency could hold the bond over the objection of the bidder and then decide not to award the contract to the bidder or even could decide to award the contract to another bidder. Instead, the proper interpretation of Section 105 is that it gives the public agency 45 days to in some way commit itself or risk losing the bid. Here, plaintiff did not commit itself and as a result lost the Hendrickson bid. Hence, the interpretation of Section 105 by the New York state courts was reasonably foreseeable and, therefore, plaintiff should have planned its actions in anticipation of such an interpretation.

the total elimination of the requirement that plaintiff, by some means, deliver an executed contract or equivalent binding notice of award in order to bind itself and the bidding contractor.

**13.** Industry custom is not necessarily controlling on the question of reasonableness. The

## VIII.

In its briefs and at oral argument, plaintiff indicated that it intended to present an expert at trial to testify that plaintiff's management of Hendrickson's bid was reasonable. But in response to a properly supported motion for summary judgment, plaintiff may not rely upon mere allegations of counsel but must present evidence, by affidavit or otherwise. RUSCC 56(f); *Sweats Fashions*, 833 F.2d at 1562–63. Here, plaintiff has failed to present an affidavit from its purported expert. Moreover, to the extent that plaintiff did describe the substance of its expected expert witness testimony, even had the expert presented the pertinent factual contentions in affidavit form, this court would still conclude that summary judgment is appropriate.

As purported proof that plaintiff acted prudently, plaintiff alleges that other large New York municipalities often do not succeed in making contract awards within the 45–day period. Plaintiff also alleges that it has awarded hundreds of millions of dollars without an analogous withdrawal situation and, hence, should not reasonably have anticipated Hendrickson's withdrawal. But the underlying factual allegations, even if true, are not sufficient to create a triable issue of fact. Based on the undisputed facts, regardless of industry practice or plaintiff's own successful bidding history, plaintiff reasonably should have expected that Hendrickson might take advantage of Section 105 and withdraw its bid at some point between the 45th and 89th days.[13]

Indeed, Hendrickson's withdrawal hardly could have come as a complete surprise to plaintiff. There was nothing unethical or improper in Hendrickson's decision to withdraw its bid. It was merely exercising its statutory rights under Section 105. Section 105 is predicated on the recognition that some contractors would choose to

standard to be applied is whether plaintiff acted with ordinary prudence, not with ordinary imprudence. *See, e.g., Salem v. United States Lines Co.*, 370 U.S. 31, 37 n. 6, 82 S.Ct. 1119, 1123 n. 6, 8 L.Ed.2d 313 (1962); *The T.J. Hooper v. Northern Barge Corp.*, 60 F.2d 737, 740 (2d Cir.), *cert. denied*, 287 U.S. 662, 53 S.Ct. 220, 77 L.Ed. 571 (1932).

withdraw bids after 45 days if no award was previously made and is designed to grant contractors precisely such an option. When contractors are faced with the determination of whether to exercise their Section 105 option to withdraw, the contractors can be expected to base their decision on an assessment of their financial self interest. Hence, Hendrickson could be expected to withdraw its bid if, for whatever reason, it came to the conclusion that such a withdrawal furthered its financial interest. In this regard, public agencies subject to Section 105 must recognize that there are always a myriad of potential reasons why a contractor may choose to withdraw its bid even if the contractor had believed that the bid would be profitable at the time it was made. For example, there could be a change in the contractor's workload or financial status or the contractor may simply chose to shift its resources to a more profitable business of which it was not aware at the time it offered its bid. But here, plaintiff had a special warning that withdrawal may be in Hendrickson's financial interest. Hendrickson's bid was approximately $1.5 million below estimate and nearly $1 million below the next lowest bid. The comparatively low nature of Hendrickson's bid, while rendering the bid highly attractive to plaintiff, would tend to suggest that Hendrickson may have viewed the bid in a less than favorable light.

In this overall factual context, plaintiff should have been aware of the reasonable possibility that Hendrickson would seek to withdraw its bid and, therefore, plaintiff should have expeditiously taken the steps necessary to bind Hendrickson to its bid so as to preclude Hendrickson from resorting to the Section 105 option. Even if all of the facts, including the facts proffered by plaintiff, are viewed in the light most favorable to plaintiff, a conclusion cannot be supported that plaintiff acted with ordinary prudence and that its failure to award the contract within 89 days after bid opening was reasonable. On this issue, there is no genuine dispute as to any material fact and defendant is entitled to judgment as a matter of law.

## IX.

■ Plaintiff contends that even if summary judgment is granted on the allegation that plaintiff acted imprudently in failing to make the award before Hendrickson withdrew its bid, a trial is necessary to resolve factual issues as to how much of the $3,219,662 difference between Hendrickson's bid and the subsequent contract cost could properly be disallowed. Plaintiff argues that because Hendrickson's bid was so far below the engineer's estimate and the next lowest bid, the bid was not a realistic representation of what the job would have cost Hendrickson and, hence, the job would have ended up costing plaintiff much more than Hendrickson had bid. But there was no guarantee that Hendrickson would make any minimum level of profit, or even that Hendrickson would avoid a loss. Under the contract, Hendrickson would have been legally bound to complete the job at the contract price, and plaintiff has not presented any evidence, expert or otherwise, to suggest that Hendrickson would not have been able to comply with this contractual obligation had plaintiff completed the contract formation in a timely manner.

Plaintiff does present an affidavit that states that the much higher price of the rebid contract was affected by inflation and by the availability of sewer construction jobs at the time. But these facts, if proved, would not lower the amount of damages to which plaintiff is liable. The imprudent act here was plaintiff's failing to "lock in" Hendrickson's bid. Since prudent action by plaintiff would have bound Hendrickson to perform the work at the contract price, all of plaintiff's costs above Hendrickson's bid exceed the costs which would have been incurred by an ordinarily prudent person and hence are not allowable costs under the contract.

### Conclusion

Defendant has satisfied its initial burden as the moving party to demonstrate the absence of any dispute as to a material issue of fact. Defendant set forth allegedly undisputed material facts and has dem-

onstrated that based on these facts, it would be entitled to judgment as a matter of law that plaintiff managed Hendrickson's bid in an unreasonable and imprudent manner and that the EPA properly disallowed the $3,219,662 in additional costs to complete the work covered by Contract III–7. Under the applicable rules, therefore, the burden shifts to plaintiff to set forth "specific facts showing that there is a genuine issue for trial." RUSCC 56(f). But, as explained above, the facts presented and properly supported by plaintiff are not material in that even if proved, they would not support a conclusion that plaintiff's management of Hendrickson's bid was reasonable, much less that the EPA's determination that plaintiff's management was unreasonable was "arbitrary or capricious or so grossly erroneous as to imply bad faith." *Knotts*, 121 F.Supp. 630, 128 Ct.Cl. at 491.

Accordingly, summary judgment is granted to defendant on plaintiff's claim that defendant improperly disallowed $3,219,662 in costs incurred by plaintiff for Contract III–7. On or before August 28, 1992, the parties shall file a status report, jointly or separately, advising the court as to their intentions with respect to the remaining issues in this action.

IT IS SO ORDERED.